**Joseph KONIKOV, Plaintiff,**

v.

**ORANGE COUNTY, FLORIDA, Joel D. Hammock, Jim Powers, Robert Burns, Robert High, Defendants.**

**No. 6:02-CV-376-ORL-28-JGG.**

United States District Court,
M.D. Florida,
Orlando Division.

Jan. 2, 2004.

John T. Stemberger, Law Offices of John Stemberger, Orlando, FL, Frederick H. Nelson, Law Offices of Frederick H. Nelson, P.A., Altamonte Springs, FL, for plaintiff.

Gary M. Glassman, Rebecca S. Smith, Orange County Attorney's Office Litigation Section, Orlando, FL, for defendants.

I. William Spivey, II, Greenberg Traurig, P.A., Orlando, FL, for movant.

**ORDER**

ANTOON, District Judge.

Rabbi Joseph Konikov ("Plaintiff") has sued Orange County, Florida ("the County") and several members of the County's Code Enforcement Board ("the Individual Defendants"), alleging that his right to practice his religion has been violated by the County's enforcement of its land use code. Plaintiff contends that the code—both on its face and as applied against him—infringes on his federal and state constitutional rights and violates the provisions of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc–5, and Florida's Religious Freedom Restoration Act of 1998 ("Florida RFRA"), Sections 761.01–05, Florida Statutes.

This case is currently before the Court on the Defendants' Alternative Motion for Summary Judgment (Doc. 203). Defendants maintain that the provisions of the Orange County Code at issue are constitutionally sound both on their face and as applied. Defendants further assert that the Code and its application satisfy both RLUIPA and Florida RFRA, but that in the event they do not, these statutes are unconstitutional.[1] Having considered the parties' submissions and arguments, the Court agrees that Defendants' Alternative Motion for Summary Judgment must be granted as to all counts of the Complaint.

## *I. Background*

It is undisputed that "Plaintiff holds sincere religious beliefs compelling him to share his religious message with other persons." (Statement of Facts Admitted, Joint Pretrial Statement, Doc. 235). Indeed, "Plaintiff's religious beliefs and mandates compel him to meet with other persons in order to share his religion," and "[i]n Plaintiff's religious tradition, a minimum of ten (10) persons over the age of thirteen must be able to pray together." (Statement of Facts Admitted, Joint Pretrial Statement, Doc. 235).

Plaintiff is the current owner of the real property at 6756 Tamarind Circle in Orlando, Florida ("the Property"). The Property, which is located in a residential neighborhood in the Sand Lake Hills Section Two subdivision ("the Subdivision"), consists of a quarter-acre lot and a single-family residence thereon. Plaintiff purchased the property on March 7, 2002, after having leased the Property and lived there as a tenant since at least July 31,

1. On the issue of RLUIPA's constitutionality, the United States of America has intervened and has filed a memorandum in support of that statute's constitutionality (Doc. 164). Additionally, an amicus brief on the issue of RLUIPA's constitutionality has been filed by The Becket Fund for Religious Liberty (Doc. 173).

2001. The Property and the Subdivision are in an "R–1A" zone under Chapter 38 (Zoning) of the Orange County Code ("OCC" or "the Code").

Chapter 38 of the Code provides that land and buildings shall be used only as permitted in the district where they are located. *See* OCC § 38–3(a). Uses fall into one of three categories: those that are permitted as of right, those that are permitted only if a special exception is obtained, and those that are prohibited altogether. *See* OCC § 38–74. The uses for each type of district are set forth in the "Use Table" contained in Section 38–77; criteria for special exceptions are contained in Section 38–78; and "Conditions for Permitted Uses and Special Exceptions" are codified in Section 38–79.

Use of land as a single-family home is a permitted use in an R–1A zone. However, use of land as a "religious organization" in an R–1A zone, like many other uses, is permitted only if a special exception is obtained. OCC § 38–77. Among the criteria for the granting of a special exception are that "[t]he use ... be similar and compatible with the surrounding area," that "[t]he use ... be consistent with the pattern of existing development," and that "[t]he use ... not act as a detrimental intrusion into an existing area." OCC § 38–78(4), (5), & (6). It is undisputed that Plaintiff never sought a special exception to operate a religious organization on the Property.

"Religious organization" is not defined in the OCC, but the list of definitions does include an entry for "religious Institution," providing, "Religious Institution shall mean a premises or site which is used primarily or exclusively for religious worship and related religious activities." OCC § 38–1. Religious organizations are permitted without the need for obtaining a special exception in six types of zones, and such organizations are allowed as special uses in all but six other types of zones. OCC § 38–77, Use Table, at 2843. While "religious organizations" and many other uses are allowed to operate in an R–1A zone if a special exception is obtained, hundreds of other specific uses are prohibited in R–1A zones; i.e., those uses are not allowed even by special exception. *See* Use Table, OCC § 38–77.

Sometime in 2000 or 2001, the Orange County Code Enforcement Division ("the Enforcement Division") began to receive complaints from residents of the Subdivision that religious services were being conducted at the Property and that traffic problems had resulted. (Ex. 1 to Doc. 205, at 26). The Enforcement Division conducted an investigation into these complaints.

On March 9, 2001, Officer George LaPorte of the Enforcement Division issued a Code Violation Notice to Plaintiff and the then-owners of the Property, Carl and Danae Hall ("the Halls"). (Ex. 2 to Doc. 205, at 74). The notice stated that the Property was in violation because "operating a synagogue or any function related to synagogue and or church services is not a permitted use in residential zoned area." (Ex. 2 to Doc. 205, at 74). A hearing regarding that violation notice was scheduled for June 20, 2001; however, that hearing was cancelled. (*See* Joint Pretrial Statement, Statement of Admitted Facts ¶¶ 16–17).

Several months later, on February 4, 2002, Officer Edward Caneda of the Enforcement Division issued another Code Violation Notice to Plaintiff and the Halls. (Ex. 2 to Doc. 205, at 65). The notice described the violation as "Religious organization operating from a residential property without special exception approval." (Ex. 2 to Doc. 205, at 65). Plaintiff and the Halls were given seven days to bring the Property into compliance. (Ex. 2 to Doc. 205, at 65).

The County determined that the Property was not brought into compliance within the seven-day period, and on March 20, 2002, a hearing was held before the Code Enforcement Board during which evidence was presented and witnesses testified[2] (Ex. 1 to Doc. 205). Plaintiff was represented at the hearing by an attorney. (Ex. 1 to Doc. 205, at 2). Code Enforcement Officer Caneda described the code enforcement investigation and presented evidence obtained during that investigation. (Ex. 1 to Doc. 205, at 23–24).

The investigation began on or about July 13, 2001 and continued through March 19, 2002. (Ex. 1 to Doc. 205, at 72). The investigators did not check the Property every day during that time period; rather, they observed the Property on sixty-eight days and noted activity on forty-nine of those days. On the other nineteen visits, no activity was observed. (Ex. 1 to Doc. 205, at 25). The investigation included the taking of photographs at and near the Property and an activity study of the Property. The photographs revealed numerous vehicles parked near the Property, including on the grass toward the sidewalk rather than on the street. On the forty-nine days on which activity was noted, the Enforcement Division observed a total of 510 people enter the Property and 373 cars (other than Plaintiff's cars) parked at or near the Property from which people went to the Property. (Ex. 1 to Doc. 205, at 24). Caneda also submitted into evidence an activity report and information obtained from an Internet website regarding the services on the Property.[3] (Ex. 1 to Doc.

2. In his response memorandum (Doc. 212), Plaintiff contended that some of the witnesses at the code enforcement hearing—Rabbi Sholom Dubov, Jeffrey Lessel, Daniel Brads, and Assistant County Attorney Gary Glassman—were not sworn under oath and thus their testimony was not properly considered by the Board and should not be considered by the Court. Prior to oral argument, the Defendants moved to file two additional exhibits, a videotape of the Board hearing and an affidavit of witness Daniel Brads, in order to establish that Dubov, Lessel, and Brads (but not attorney Glassman) had been sworn at the hearing. (Doc. 213, filed August 25, 2003). In his response to that motion (Doc. 220), Plaintiff challenges only the "testimony" of Mr. Glassman and apparently now concedes that the other witnesses were duly sworn. Indeed, it appears from the transcript of the Code Enforcement Board hearing that the witnesses were sworn *en masse.* (*See, e.g.,* Ex. 1 to Doc. 205, at 46, 89). Significantly, Plaintiff, who was represented by counsel at the Code Enforcement hearing, did not object that any of these witnesses—two of whom testified on Plaintiff's behalf, not the County's—had not been sworn. Finally, Mr. Glassman is an attorney, not a witness, and he presented overview and argument, not testimony. Thus, Plaintiff's objection to his "testimony" is not well-taken.

3. Plaintiff now attempts to challenge the Internet printout that was submitted to the Board during the hearing. However, he did not raise any objection to the Board's consideration of that information at the hearing, nor did he challenge its accuracy. At this juncture it is important to note that Plaintiff did not appeal the determinations made by the Board, and this Court does not sit in review of those factual findings but only to address Plaintiff's constitutional and statutory challenges. *See, e.g., Westchester Day Sch. v. Vill. of Mamaroneck,* 280 F.Supp.2d 230, 233 (S.D.N.Y.2003) ("Initially, we are mindful of the general proscription that federal courts should not become zoning boards of appeal to review land use determinations. However, 'federal courts may exercise jurisdiction in zoning matters when local zoning decisions, such as here, infringe national Interests protected by statute or by the constitution.' ") (internal citation omitted) (quoting *Innovative Health Sys., Inc. v. City of White Plains,* 931 F.Supp. 222, 234 (S.D.N.Y.1996)); *Tran v. Gwinn,* 262 Va. 572, 554 S.E.2d 63, 65 (2001) (noting trial court's conclusion that "because the [zoning appeals board's] finding that a church was being operated on Tran's property had not been appealed, it was a thing decided"). The Internet printout will be considered as a part of the record that was before the Code Enforcement Board.

205, at 25; Ex. 2 to Doc. 205, at 24–26; *see also* Ex. 1 to Doc. 205, at 36).

The Internet printout, which is from a website beginning with "www.jewishorlando.com," lists the address of Plaintiff's Property directly beneath a logo for the "Chabad of South Orlando," and Plaintiff is listed as "Rabbi Yosef Konikov, Director." (Ex. 2 to Doc. 205, at 24). In addition to the website printout, a brochure for the "Chabad of South Orlando" is contained in the written record that was before the Code Enforcement Board. (Ex. 2 to Doc. 205, at 29–29c). That brochure provides in part that the "Chabad's Services are open to all Jews." (Ex. 2 to Doc. 205, at 29a). The brochure lists times and places of services, some of which were to be held at a local school and a hotel. (Ex. 2 to Doc. 205, at 29b). Additionally, however, the brochure invites attendance at scheduled Shmini Atzeret and Simchat Torah services on Plaintiff's Property. (Ex. 2 to Doc. 205, at 29c). Brochure readers are advised in large print to call "Rabbi Yosef or Chani Konikov" for more information, and the phone number provided is the same as the one listed on the website. (Ex. 2 to Doc. 205, at 24, 29b).

Several of Plaintiff's neighbors also testified at the Code Enforcement Board hearing. Ted McDonald testified that the Subdivision consists of single-family dwellings and is not a commercial or business environment. (Ex. 1 to Doc. 205, at 35–36). McDonald stated that "[a] high traffic business is being run out of a single-family dwelling" and "[t]he business is being advertised on the internet." (Ex. 1 to Doc. 205, at 36). McDonald noted that according to the Internet, there were eleven scheduled meetings per week at the Property—including some type of meeting each day of the week—and eight additional "possible" meetings per week. (Ex. 1 to Doc. 205, at 57; Ex. 2 to Doc. 205, at 23).

McDonald also testified that there was a sign on the front door of the Property that stated, "[K]indly use the side entrance for the shul." (Ex. 1 to Doc. 205, at 37). A photograph of this sign was submitted into the record. (Ex. 2 to Doc. 205, at 27). The activities at the Plaintiff's Property and the resulting traffic had affected McDonald's peaceful enjoyment of his property, which he had owned for twenty-five years. (Ex. 1 to Doc. 205, at 38, 40). McDonald also presented "nearly 300 petitions" in support of enforcement of the ordinances. (Ex. 1 to Doc. 205, at 41).

Another neighbor, Peter Nee, testified that he walks, jogs, or bicycles in the neighborhood every day and that "it's getting to be a problem with a lot of the cars." (Ex. 1 to Doc. 205, at 46). Daniel Brads, who lives directly across the street from the Property, testified that he had replaced eight sprinkler heads nearly four feet from the street, almost at the sidewalk. (Ex. 1 to Doc. 205, at 112). Brads spoke to Plaintiff about the sprinkler heads, but Plaintiff told Brads that Brads could not prove that the broken sprinkler heads were caused by vehicles related to the activities at the Property. (Ex. 1 to Doc. 205, at 111–12). Brads stated that "[t]he issue is the fact that those cars are getting on my property line" and "[t]he fact that they run over my sprinkler heads," cause damage, park in front of the fire hydrant, and double-park. (Ex. 1 to Doc. 205, at 113). Brads concluded by explaining, "I bought my house four years ago. I did not buy my house next to a chabad or a synagogue or anything else. I bought my house in a residential neighborhood four years ago. And now it's become changed. That's the issue." (Ex. 1 to Doc. 205, at 114).

Other witnesses testified in favor of Plaintiff. Jeffrey Lessel, who had been attending prayer services at the Property

for a year and a half prior to the hearing, testified that he did not know of anyone being ticketed for parking illegally during that time, nor had he noticed any adverse effects on the neighborhood from the prayer services. (Ex. 1 to Doc. 205, at 101–03). According to Lessel, fifteen or eighteen people prayed there on Friday night and twenty-five people prayed there on Saturday mornings. (Ex. 1 to Doc. 205, at 104). Occasionally there is a Bible study on Wednesday. (Ex. 1 to Doc. 205, at 104).

The affidavit of a neighbor, Edward Lerman, was read into the record at the hearing. (Ex. 1 to Doc. 205, at 58; Ex. 2 to Doc. 205, at 18). Lerman lives two houses down from Plaintiff and stated that he was "shocked" by the "unfounded claims" regarding "traffic and parking disruptions and ... noise from [Plaintiff's] home." (Ex. 2 to Doc. 205, at 18). Lerman had "never heard any noise or disruption coming from [Plaintiff's] home," that he had "never observed traffic problems or parking disruptions" during the prayer meetings, that his lawn had not been destroyed by parked cars, and that "[t]he cars parked in front of the [Plaintiff's] home are no different than any of the other cars parked in front of my other neighbor [sic] homes when they hold parties or other social gatherings." (Ex. 2 to Doc. 205, at 18).

In addition to these witnesses, several local religious leaders testified at the Code Enforcement Board hearing. Kevin Urichko, the pastor at Northland Community Church in Longwood, Florida, testified that his church has 7,000 worshipers on weekends and 200 small groups that meet in homes. (Ex. 1 to Doc. 205, at 50). Urichko's church has a website, and the individual homes that have prayer groups are listed on the website. (Ex. 1 to Doc. 205, at 52). Most of those home groups meet weekly. (Ex. 1 to Doc. 205, at 53). The most that the prayer groups get together is two or three times a week. (Ex. 1 to Doc. 205, at 53). The average number of people in a group is twelve, but some groups consist of as few as six or as many as thirty-five. (Ex. 1 to Doc. 205, at 54). In an affidavit that was read into the record at the hearing, another pastor of Northland Church stated that Northland Church has 200 home groups that meet weekly throughout central Florida. (Ex. 1 to Doc. 205, at 55; Ex. 2 to Doc. 205, at 9–10).[4]

Ken Bogel, associate pastor at Trinity Baptist Church in Apopka, testified that his church has a website that lists its weekly activities, including "some Bible studies and groups meeting in homes." (Ex. 1 to Doc. 205, at 105). The study groups meet once per week and consist of twenty-five to thirty people each. (Ex. 1 to Doc. 205, at 106). Bogel expressed concern about ambiguity in the ordinance and how frequently groups could permissibly meet. (Ex. 1 to Doc. 205, at 105–06). In an affidavit that was submitted into the record, Pastor Wayne Brooks of Metro Life Church stated that his church has 18 home groups that meet weekly throughout Central Florida, including 10 groups in Orange County. (Ex. 1 to Doc. 205, at 57; Ex. 2 to Doc. 205, at 15–16).

Rabbi Sholem Dubov testified that he is the executive director of the Chabad of Greater Orlando and the founder of Chabad Organizations of Central Florida. (Ex. 1 to Doc. 205, at 100). According to Rabbi Dubov, there are six such organizations, and Plaintiff "is one of our organizations." (Ex. 1 to Doc. 205, at 100).

4. The word "weekly" appears in the affidavit but was omitted from the hearing transcript. (*See* Ex. 1 to Doc. 205, at 56).

After considering this evidence, on March 21, 2002 the Code Enforcement Board issued its "Findings of Fact, Conclusions of Law, and Order." (Ex. 2 to Doc. 205, at 4). Based on the record before it, the Code Enforcement Board concluded Plaintiff was operating a religious organization from a residential property without special exception approval and thus was in violation of Sections 38-3, 38-74, and 38-77 of the Orange County Code. (Ex. 2 to Doc. 205, at 4). The corrective action required by the Board was for Plaintiff to "[o]btain special exception approval or cease religious organization operations." (Ex. 2 to Doc. 205, at 4). Plaintiff did not take either of these actions, and eventually a per diem fine was imposed for Plaintiff's continued violation.

Shortly thereafter, Plaintiff filed this lawsuit against the County and four members of its Code Enforcement Board—Joel Hammock, Jim Powers, Robert Burns, and Robert High. (Doc. 1). In his Complaint, Plaintiff alleges nine counts: Count I—Violation of the Right to Free Exercise of Religion Under the United States and Florida Constitutions; Count II—Violation of the Right to Equal Protection Under the Untied States and Florida Constitutions; Count III—Violation of the Establishment Clause of the United States and Florida Constitutions; Count IV—Violation of Free Exercise of Religion Under RLUIPA; Count V—Violation of Free Exercise of Religion Under Florida RFRA; Count VI—Violation of Free Speech and Assembly Under the United States and Florida Constitutions; Count VII—Violation of Right to Privacy Under the United States and Florida Constitutions; Count VIII—Violation of Right to Due Process Under the United States and Florida Constitutions; and Count IX—Civil Conspiracy.

In their summary judgment motion (Doc. 203), Defendants seek entry of judgment in their favor on all nine counts.[5] The instant motion is the second summary judgment motion that Defendants have filed in this case. In response to Defendants' first motion (Doc. 125), Plaintiff argued that the Defendants had improperly relied on evidence—particularly, deposition transcripts—that the Code Enforcement Board did not have before it, and which did not exist, at the time of the hearing. (*See* Doc. 168 at 15). Defendants relented and filed their second motion (Doc. 203) without reference to evidence not considered by the Board. At oral argument the parties agreed that the second motion superseded the first motion and is the operative motion before the Court.[6] (*See* Tr. of Hr'g on Mot. for Summ. J., Doc. 223 at 95-96).

## *II. Discussion*

### *A. Summary Judgment Standards*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain.

5. Although the Alternative Motion only specifically addresses Counts I-VIII, it refers to the prior motion in support of judgment on the civil conspiracy claim in Count IX (Doc. 203 at 4 n.4).

6. While the parties agree that the second summary judgment motion (Doc. 203) is the operative motion, on some issues the parties rely on their respective memoranda regarding the first motion; thus, on occasion reference is made herein to those memoranda even though they are styled as relating to the first motion rather than the second.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

*B. The Merits of Defendants' Motion*

*1. Free Exercise (Count I)*

In Count I of the Complaint, Plaintiff alleges that the Orange County zoning provisions on their face and as applied against him violate his right to the free exercise of his religion under the First Amendment to the United States Constitution [7] and Article I, Section 3 of the Florida Constitution.[8] However, Plaintiff's claim is not well-founded. The Orange County zoning ordinances comprise a valid system of land use regulation that does not infringe on Plaintiff's constitutional rights.

Over the years, the principles applicable to free exercise challenges have evolved in United States Supreme Court jurisprudence. In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court held that South Carolina could not apply its unemployment compensation statute in a manner that excluded a worker from eligibility based on her religion-based objection to working on Saturday. The Court found that the disqualification from benefits burdened the free exercise of the worker's religion and that no compelling state interest justified the infringement of the worker's free exercise rights. In *Wisconsin v. Yoder,* 406 U.S. 205, 214, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Court again applied a rigid standard in the free exercise context, speaking of the necessity of "a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause."

Eighteen years later, the Supreme Court decided *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), revisiting the principles espoused in *Sherbert.* At issue in *Smith* was whether two Native Americans who were fired from their jobs for ingesting peyote for sacramental purposes at a religious ceremony were entitled to unemployment benefits. The Court found that Oregon did not violate the Free Exercise Clause by denying benefits to the workers, noting that the Court had "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." 494 U.S. at 878–79, 110 S.Ct. 1595. In declining to apply the *Sherbert* "compelling interest" test to generally applicable laws like the one at issue in

7. The First Amendment provides in pertinent part that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. 1. Of course, Plaintiff's claim under the First Amendment, like his other federal constitutional claims, is asserted via the Fourteenth Amendment.

8. Article I, Section 3 of the Florida Constitution provides in part, "There shall be no law ... prohibiting or penalizing the free exercise [of religion]. Religious freedom shall not justify practices inconsistent with public morals, peace or safety." Fla. Const. art. 1, § 3.

*Smith*, the Court noted that "[t]he government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.'" *Id.* at 885, 110 S.Ct. 1595 (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)). Thus, in *Smith*, the Supreme Court limited the types of cases in which strict scrutiny would be applied.

Three years after *Smith*, the Court decided *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("*Lukumi*"). In *Lukumi*, the Court addressed the constitutionality of city ordinances that prohibited animal sacrifices for ritual purposes. In finding the ordinances unconstitutional, the Court concluded that the laws were not neutral and had been passed specifically for the purpose of stopping certain activities of one religious group; thus, the laws did not satisfy *Smith*. The facts of *Lukumi* were quite extreme—the evidence was overwhelming that in enacting the ordinances the City had intentionally targeted the practices of one religion throughout the City; zoning was not involved. The ordinances at issue plainly "regulate[d] or prohibit[ed] conduct because it [wa]s undertaken for religious reasons." *Id.* at 532, 113 S.Ct. 2217.

The Court stated that "[a]lthough a law targeting religious beliefs as such is never permissible, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id.* at 533, 113 S.Ct. 2217 (citations omitted). Finding that the ordinances at issue were not laws of "general applicability" like the one at issue in *Smith*, the *Lukumi* Court nevertheless declined to "define with precision the standard used to evaluate whether a prohibition is of general application, for these ordinances fall well below the minimum standard necessary to protect First Amendment rights." *Id.* at 543, 113 S.Ct. 2217. The Court held that "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny[,] ... must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Id.* at 546, 113 S.Ct. 2217. The Court recognized that "[a] law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Id.* The *Lukumi* Court thus clarified that notwithstanding *Smith's* holding regarding laws of general applicability, laws that are not generally applicable and which burden the practice of religion are still subject to strict scrutiny.

Although courts have wrestled with the issue of how to apply *Smith* and *Lukumi*—particularly in the context of zoning—this Court is assisted by controlling precedent that dictates the proper course to be taken in this case. Even before the *Smith* Court had refined the standards of *Sherbert*, the Eleventh Circuit had decided *Grosz v. City of Miami Beach*, 721 F.2d 729 (11th Cir.1983), a decision which remains the law of this circuit and which governs the resolution of Plaintiff's free exercise claim.

The facts of *Grosz* are strikingly similar to those of the instant case. The plaintiffs lived in a single-family residence in the City of Miami Beach in an "RS-4" zone—a zone for single-family residential use. A Miami Beach ordinance had been construed by the City to prohibit churches,

synagogues, and similarly organized religious congregations in RS–4 zones. One of the plaintiffs was "a Rabbi and the leader of an orthodox Jewish sect." *Id.* at 731. His religion required him "to conduct religious services twice daily in a congregation of at least ten adult males." *Id.* One of the plaintiffs "ha[d] referred to the congregation as a shul, and a witness, who is a neighbor of plaintiffs, has testified that persons have come to her house asking for directions to the 'Grosz shul.' " *Id.* at 731–32.

The Groszes held religious services in their home at least twice each day. *Id.* at 732. Although the services "usually cause[d] no substantial disturbance to the neighborhood, ... well-attended services have disturbed neighbors as a result of persons seeking directions to the Grosz shul, as a result of chanting and singing during the services, and as a result of the occasionally large congregations of worshippers at the property." *Id.* The Groszes were given a "notice of violation" of the zoning ordinance by the City. "The City did not and would not prosecute plaintiffs for praying in their home with ten friends, neighbors, and relatives, even on a regular basis." *Id.* However, the notice of violation "was issued because of the City's view that [the Groszes'] twice daily performance of religious ceremonies on their property conflict[ed] with [the] use restrictions [in the ordinance]. This conclusion stems from the City's position that religious ceremonies conducted on the Grosz property occasionally constitute[d] organized, publicly attended religious services." *Id.* (footnote omitted). Churches, synagogues, and other religious institutions were permitted to operate in all other zoning districts except the RS–4 district, and at least half of the City's area was zoned such that religious uses were permitted. *Id.* Thus, it was possible for the plaintiffs to conduct the services "in many other areas within the City of Miami Beach, including an area within four blocks of their home." *Id.* at 731.

The Groszes brought suit in federal district court, contending that the ordinance was facially unconstitutional as overbroad and vague, as well as unconstitutional as applied against them. On cross-motions for summary judgment, the district court found the ordinance facially constitutional but that it was unconstitutional as applied to the Groszes because it burdened their free religious exercise and the City's interest in enforcement of its zoning laws was not "a compelling state interest." *Id.* at 733.

The Eleventh Circuit reversed, concluding that the zoning ordinance did not violate free exercise. The court began by noting that the Miami Beach ordinance passed two threshold tests—it regulated conduct rather than beliefs, and it had both a secular purpose and effect. The court then proceeded to balance the interests of the government against the plaintiffs' religious interests, noting that "the balance depends upon the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity. This principle marks the path of least impairment of constitutional values." *Id.* at 734.

The Eleventh Circuit discussed the burden on the government:

> The City of Miami Beach asserts a governmental interest in enforcing its zoning laws so as to preserve the residential quality of its RS–4 zones. By so doing the City protects the zones' inhabitants from problems of traffic, noise and litter, avoids spot zoning, and preserves a coherent land use zoning plan. The Supreme Court has acknowledged the importance of zoning objectives, stating that segregation of residential from nonresidential neighborhoods "will increase the safety and security of home life,

greatly tend to prevent street accidents, especially to children by reducing traffic and resulting confusion, ... decrease noise ... [and] preserve a more favorable environment in which to raise children." **The City asserts a significant governmental objective in the case at bar.**

Gatherings for organized religious services produce, as do other substantial gatherings of people, crowds, noise and disturbance. In fact, the parties' stipulations reveal that the City was acting pursuant to neighbors' complaints to end the disturbance caused by Appellees' conduct. Given this total inconsistency between the accomplishment of the City's policy objectives and the continuance of Appellees' conduct, **the government action in this case easily passes the least restrictive means test.**

Doctrine also requires that we consider the impact of a religious based exemption to zoning enforcement. In that regard we find that granting an exception would defeat City zoning policy in all neighborhoods where that exception was asserted. Maintenance of the residential quality of a neighborhood requires zoning law enforcement whenever that quality is threatened. Moreover, no principled way exists to limit an exception's costs just to the harm it would create in this case. Crowds of 500 would be as permissible as crowds of 50. Problems of administering the exception such as distinguishing valid religious claims from feigned ones, therefore, need not even be considered. A religion based exception would clearly and substantially impair the City's policy objectives. **Together, the important objectives underlying zoning and the degree of infringement of those objectives caused by allowing the religious conduct to continue place a heavy weight on the government's side of the balancing scale.**

*Id.* at 738–39 (emphasis added) (citations omitted).[9]

Turning to the burden on the Groszes' religious interests, the Eleventh Circuit noted that Naftali Grosz's religion "requires him to conduct religious services twice daily in the company of at least ten adult males." *Id.* at 739. Although the court found that the solicitation of persons to attend the services and participation of groups larger than ten were "not integral to [Grosz's] faith," the court assumed "that the nonessential practices further the religious conduct [and] ... that [the Groszes] suffer some degree of burden on their free exercise rights." *Id.*

In measuring the degree of the Groszes' burden, the Eleventh Circuit noted that the city had not prohibited religious conduct but instead "prohibit[ed] acts in furtherance of this conduct in certain geographical areas." *Id.* at 739. Indeed,

9. *Cf. Vill. of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) ("A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one .... The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people."); *Vill. of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 386–87, 47 S.Ct. 114, 71 L.Ed. 303 (1926) ("[W]ith the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities.... [W]hile the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation.").

"publicly attended religious activities" were permitted in all but the RS-4 single family zoning districts. *Id.* The court thus concluded that the Groszes could "conduct the required services in suitably zoned areas, either by securing another site away from their current house or by making their home elsewhere in the city" and that "[i]n comparison to the religious infringements analyzed in previous free exercise cases the burden here stands towards the lower end of the spectrum." *Id.*

In assessing the "final balance" between the government interest and the religious interest at issue, the *Grosz* court concluded that in light of "the substantial infringement of the City's zoning policy that would occur were the [Groszes'] conduct allowed to continue ... the burden upon government to allow [the Groszes'] conduct outweighs the burden upon the [Groszes'] free exercise interest." *Id.* at 741. Thus, the Eleventh Circuit determined that the city was entitled to enforce its zoning ordinance notwithstanding the limitations the ordinance imposed on the Groszes' religious activities.

*Grosz* is indistinguishable from the instant case and is therefore *controlling*. Like the City of Miami Beach, Orange County has a legitimate interest in enacting and enforcing its zoning laws,[10] and like the burden on the Groszes' interest, the incidental burden on Plaintiff's religious exercise is not sufficient to outweigh these important government interests. Under this binding Eleventh Circuit precedent, the Orange County zoning scheme simply does not violate Plaintiff's free exercise rights either on its face or as applied.[11]

Plaintiff argues that the *Grosz* court did not apply the strict scrutiny required here.

**10.** The OCC explains the purpose of the R-1A zone:

> The areas included within ... R-1-A [sic] single-family dwelling districts are intended to be single-family residential areas with large lots and low population densities. Certain structures and uses required to serve educational, religious, utilities and noncommercial recreational needs of such areas are permitted within the districts as special exceptions.

OCC § 38-301. Additionally, the OCC sets forth requirements for special exceptions within R-1A zones, which includes that the application for such exceptions be accompanied by a site plane which indicates "property lines, rights-of-way, and the location of buildings, parking areas, curb cuts and driveways." OCC § 38-303(b).

**11.** Other jurisdictions have reached the same conclusion in similar cases. *See, e.g., Tran v. Gwinn,* 262 Va. 572, 554 S.E.2d 63, 66-67 (2001) (finding constitutional an ordinance which prohibited operation of place of worship in a residential zone absent a special use permit, noting that courts "have generally concluded that zoning ordinances which regulate the location of churches within the community impose only a minimal burden on the right to the free exercise of religion," that the requirement of a special use permit "imposes a minimal and incidental burden," and that "the Constitution will tolerate zoning ordinances of this type"); *Open Door Baptist Church v. Clark County,* 140 Wash.2d 143, 995 P.2d 33, 47 (2000) (noting that if churches were exempt from zoning application requirements, "one could choose to live in a neighborhood for its entirely residential nature, wake up one morning and find that all other houses on one's block had been replaced by church buildings, and be left without any recourse.... The better approach, we think, is ... that 'we ought to require a very specific showing of hardship to justify exemption from land use restrictions.' ") (quoting *First Covenant Church of Seattle v. City of Seattle,* 114 Wash.2d 392, 787 P.2d 1352, 1364 (1990) (Utter, J., concurring)); *cf. Congregation Kol Ami v. Abington Township,* 309 F.3d 120, 136 (3d Cir.2002) ("A necessary corollary of the extensive zoning authority bestowed upon local municipalities, including the authority to create exclusively residential districts, is the authority to make distinctions between different uses and to exclude some uses within certain zones. Indeed, zoning is by its very design discriminatory, and that, alone, does not render it invalid.").

Under such an analysis, a government action that substantially burdens religious exercise is permissible only where that action furthers a compelling government interest through the least restrictive means. However, it is far from clear that in *Grosz* the Eleventh Circuit did not in essence apply such scrutiny. Although the court did not use the term "strict scrutiny" in its opinion, it specifically stated that the burden on the Groszes "stands toward the lower end of the spectrum," that the city's zoning scheme served a "significant governmental objective," and that "the government action in this case easily passes the least restrictive means test," 721 F.2d at 738–39. Notably, the *Grosz* district court had determined that the city's interest was not a "compelling interest," and the appellate court's reversal of the district court's ultimate finding of a free exercise violation means that either the standard or the application of that standard was not correct; either way, in light of the holding of *Grosz,* any difference between the Eleventh Circuit's analysis in *Grosz* and the strict scrutiny analysis urged by Plaintiff is of no consequence. It is important to note that although *Grosz* was decided before *Lukumi,* it was decided at a time when strict scrutiny was the prevailing standard for free exercise claims in non-zoning contexts. And, significantly, the Eleventh Circuit has since reaffirmed *Grosz's* validity and has expressly rejected the argument that it was overruled by *Lukumi.* In *First Assembly of God of Naples, Florida, Inc. v. Collier County,* 20 F.3d 419, 423 n. 4 (11th Cir.1994), the court specifically stated: "First Assembly argues that *Grosz* can no longer be considered good law because the district court relied on *Grosz* in deciding [*Lukumi*] and was reversed. We disagree. The Supreme Court [in *Lukumi* ] reversed the application of *Grosz,* not the holding of *Grosz* itself or the reasoning behind it. Therefore, the *Grosz* case, correctly applied, still has precedential value in this circuit." (Citations omitted). Thus, regardless of how the *Grosz* analysis is characterized, *Grosz* is binding on this court notwithstanding *Lukumi* and is factually indistinguishable, and Plaintiff's complaints that in *Grosz* the Eleventh Circuit employed the "wrong" analysis are unavailing.

In any event, Plaintiff's claim that the zoning ordinance or the Defendants' enforcement thereof violated the Free Exercise Clause would fail under a "straight" strict scrutiny analysis because Plaintiff has not presented evidence that the ordinance substantially burdens the free exercise of his religion. First, Plaintiff did not even bother to apply for a special exception from the zoning restrictions as allowed by the ordinance. The mere requirement that one apply for a special exception from an ordinance restricting the use of property is not a substantial burden. In *Hale O Kaula Church v. Maui Planning Comm'n,* 229 F.Supp.2d 1056, 1074 (D.Haw.2002), the district court concluded that strict scrutiny was the pertinent test to apply to a dispute involving a church's right to operate in an agricultural zone but determined that it was premature to apply that standard because the church had not submitted an application for permission to hold church services on the property. A similar result was reached by the Supreme Court of Washington in a case in which it held that a church must exhaust its administrative remedies, including applying for a conditional use permit, and that the church could not merely predict that it would be denied such a permit. *Open Door Baptist Church v. Clark County,* 140 Wash.2d 143, 995 P.2d 33, 42 (2000).

Had Plaintiff applied for and been denied a special use permit, the denial of that permit would not constitute a substantial

burden on his religious exercise. The facts here are indistinguishable from those of *Grosz,* where the Eleventh Circuit "assumed some degree of burden" due to the zoning restriction but ultimately determined that the burden on free exercise was "towards the lower end of the spectrum." 721 F.2d at 739; *see also Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F.Supp.2d 961, 986 (N.D.Ill.2003) ("The City asserts that the Ordinance restricts nothing more than the *location* of religious practice and conduct and therefore does not substantially burden Vineyard's free *exercise* of religion. There is substantial case law which supports the City's proposition.") (emphasis in original).[12]

Moreover, had Plaintiff established the existence of substantial burden, the County has in turn satisfied its burden on the compelling interest and least restrictive means prongs of strict scrutiny. In *Grosz,* the Eleventh Circuit noted that Miami Beach had asserted a "significant governmental objective," 721 F.2d at 738, and rejected the district court's ultimate finding of a free exercise violation, which was based in part on the district court's conclusion that the government interest was not "compelling," 721 F.2d at 733. A government's interest in zoning is indeed compelling. *See Murphy v. Zoning Comm'n of the Town of New Milford,* 289 F.Supp.2d 87, 108–09 (D.Conn.2003) (finding that zoning commission had established "a compelling interest in 'enforcing the town's zoning regulations and ensuring the safety of residential neighborhoods"') (quoting its prior preliminary injunction order); *First Baptist Church of Perrine v. Miami–Dade County,* 768 So.2d 1114, 1117 (Fla. 3d DCA 2000) ("[E]ven assuming that the Church has demonstrated a substantial burden on its free exercise of religion, the County clearly has a compelling interest in enacting and enforcing fair and reasonable zoning regulations.") (citation omitted); *cf. Elsinore Christian Ctr. v. City of Lake Elsinore,* 291 F.Supp.2d 1083, 1093–95 (C.D.Cal.2003) (noting that "concerns regarding the vitality of city life are of paramount importance in land use planning" and "assuming, without deciding, that curbing urban blight is a 'compelling interest'"). And, in *Grosz,* the Eleventh Circuit found that "[g]iven [the] total inconsistency between the accomplishment of the City's policy objectives and the continuance of Appellees' conduct, the government action in this case easily passes the least restrictive means test." 721 F.2d at 738. Thus, the Orange County zoning scheme survives strict scrutiny.

In sum, *Grosz* is controlling here, and no matter what test is applied, the Orange County zoning scheme is constitutionally sound and does not violate the Free Exercise Clause of the United States or Florida constitutions. Thus, Defendants are entitled to summary judgment on Count I.

*2. RLUIPA (Count IV)*

In Count IV, Plaintiff alleges that the Orange County zoning laws violate the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc to cc–5. Defendants, however, contend that Plaintiff cannot establish that the Defendants have violated

12. *Cf. Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan,* 87 Hawai'i 217, 953 P.2d 1315, 1345–46 (1998) (concluding that zoning ordinance was "system of individualized exemptions" rather than law of general applicability but that temple seeking height variance failed to present prima facie case of burden on its religious exercise where temple had created its own problems by purchasing property in a restricted zone and where "the burdens placed on the Temple by the height restrictions are of expense and inconvenience").

RLUIPA, and in the alternative, they maintain that RLUIPA is unconstitutional.

RLUIPA was enacted in 2000, three years after the United States Supreme Court in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), held a broader religious protection statute, the Religious Freedom Restoration Act of 1993 ("federal RFRA"), unconstitutional as beyond the scope of Congress's enforcement power under Section 5 of the Fourteenth Amendment. RLUIPA provides in pertinent part that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution ... is in furtherance of a compelling governmental interest ... and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). Under RLUIPA, the plaintiff bears the burden of persuasion on the issue of whether a governmental action imposes a substantial burden on religious exercise, but the government bears the burden as to "compelling interest" and "least restrictive means." 42 U.S.C. § 2000cc–2(b).

Defendants assert that Plaintiff has not demonstrated that his religious exercise has been substantially burdened by the requirement of the ordinance that Plaintiff seek a special exception. Defendants maintain that even if Plaintiff had presented evidence of such a substantial burden, the ordinance and the enforcement thereof do further a compelling government interest through the least restrictive means. As discussed in connection with Count I above, the Defendants are correct on all of these points.

As was the case with respect to Plaintiff's free exercise claim in Count I, Plaintiff has not established that his religious exercise has been substantially burdened, and the same result obtains under RLUIPA. Although RLUIPA does not define "substantial burden," it does provide as part of its definition of "religious exercise" that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc–5(7)(B). This broad definition of "religious exercise" does not, however, render the denial of a special exception under a zoning code a "substantial burden" on religious exercise.

As the Seventh Circuit recently held in *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir. 2003):

> Application of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise, including the use of property for religious purposes, would render meaningless the word "substantial," because the slightest obstacle to religious exercise incidental to the regulation of land use—however minor the burden it were to impose—could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means. We therefore hold that, in the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction generally—effectively impracticable.

(Emphasis in original). The *Civil Liberties* court went on to emphasize that while the procedural requirements of a special exception scheme, as well as scarcity of available land, "may contribute to the ordinary difficulties associated with location (by any person or entity, religious or nonreligious) in a large city, they do not render impracticable the use of real property in [the city] for religious exercise, much less discourage churches from locating or attempting to locate in [the city]." *Id.* Additionally, the mere fact that zoning provisions might make religious exercise more expensive does not amount to a substantial burden under RLUIPA; "[o]therwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations. Unfortunately for Appellants, no such free pass for religious land uses masquerades among the ... protections RLUIPA affords to religious exercise." *Id.* at 762; *see also Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F.Supp.2d 961, 991 (N.D.Ill.2003) ("Vineyard's claim under Section (a)(1) of the RLUIPA fails, however, for the same reasons its free exercise claim failed. The history of the statute demonstrates that Congress did not intend to change traditional Supreme Court jurisprudence on the definition of substantial burden."); 146 Cong. Rec. S7774–01, S7776 ("The Act does not include a definition of the term 'substantial burden' because it is not the intent of this Act to create a new standard for the definition of 'substantial burden' on religious exercise. Instead, that term as used in the Act should be interpreted by reference to Supreme Court jurisprudence.... The term 'substantial burden' as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden.").[13] Thus, because Plaintiff has not established a substantial burden on free exercise, his RLUIPA claim fails.

Assuming Plaintiff had established that he had been substantially burdened, under RLUIPA the County would then have to show that the zoning scheme serves a compelling interest though the least restrictive means. Because the County has made these showings as noted above, Plaintiff's RLUIPA claim would fail at this later stage of analysis as well.

The conclusion that no violation of RLUIPA has been established on the facts of the instant case is also consistent with the text of RLUIPA as a whole and the statute's legislative history. For example, in addition to its "substantial burdens" provisions RLUIPA also proscribes "impos[ition] or implement[ation of] a land use regulation that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). The Orange County zoning scheme treats nonreligious assemblies and religious assemblies alike—no place of assembly is permitted as of right in an R–1A zone—and thus, this provision has been satisfied. Additionally, RLUIPA bars governments from "impos[ing] or implement[ing] a land use regulation that—(A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 2000cc(b)(3). This provision suggests that Congress contemplated that

13. *But see Elsinore Christian Ctr. v. City of Lake Elsinore,* 291 F.Supp.2d 1083, 1090–91 (C.D.Cal.2003) ("Because use of land *is* 'religious exercise' under RLUIPA, there can be no doubt that the City's action denying use of the Subject Property is a 'substantial burden' on that use.") (emphasis in original).

religious assemblies could be reasonably limited within a jurisdiction, as Orange County has done through its zoning scheme, and religious assemblies clearly are not totally excluded from Orange County.

The legislative history of the statute also reflects that although Congress was concerned with discrimination against religious organizations, it did not intend to relieve such organizations from zoning ordinances or from special permit requirements. A joint statement issued by the sponsors of the legislation, Senators Orrin Hatch and Ted Kennedy, specifically explains that "[t]his Act does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay." 146 Cong. Rec. S7774–01, at *S7776. Clearly, it was not the intent of Congress to force municipalities to allow their residents to operate a religious institution in a residential subdivision.

In light of the Court's conclusion that no RLUIPA violation has been established, the Court need not reach the question of RLUIPA's constitutionality. It is " '[a] fundamental and long-standing principle of judicial restraint ... that courts avoid reaching constitutional questions in advance of the necessity of deciding them.' " *See, e.g., Elsinore Christian Center v. City of Lake Elsinore,* 291 F.Supp.2d 1083, 1087–88 (C.D.Cal.2003) (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)).

*3. Florida RFRA (Count V)*

In Count V, Plaintiff asserts that the zoning laws violate Florida's Religious Freedom Restoration Act ("Florida RFRA"), Sections 761.01–.05, Florida Statutes. Defendants make the same arguments as to Florida RFRA as they do with regard to RLUIPA—that it has not been violated and that it is unconstitutional.

Florida RFRA was enacted in 1998, one year after the Supreme Court decided *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), holding federal RFRA unconstitutional. Like RLUIPA, Florida RFRA provides that the "government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person: (a) [i]s in furtherance of a compelling governmental interest; and (b) [i]s the least restrictive means of furthering that compelling governmental interest." § 761.03(1), Fla. Stat. As discussed earlier in connection with the Free Exercise and RLUIPA counts, Plaintiff has not established a claim under these standards. *See also First Baptist Church of Perrine v. Miami–Dade County,* 768 So.2d 1114, 1117 (Fla. 3d DCA 2000) (rejecting Florida RFRA claim, noting that "the burden on the County of altering the enforcement of its zoning ordinances to accommodate the Church's requests would be much greater than any burden placed on the Church's religious activity by requiring that it comply with the Zoning Board's decision" and that "even assuming that the Church has demonstrated a substantial burden ..., the County clearly has a compelling interest in enacting and enforcing fair and reasonable zoning regulations") (citation omitted). Hence, Plaintiff has not presented evidence supporting a claim under Florida RFRA, and the Court need not reach the issue of the constitutionality of Florida RFRA.

*4. Equal Protection (Count II)*

Plaintiff alleges in Count II that the zoning laws, both on their face and as

applied to him, violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution[14] and Article I, Section 2 of the Florida Constitution.[15] The essence of equal protection is "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Plaintiff argues that the OCC zoning provisions on their face violate equal protection because they treat religious uses of property differently from similar secular uses. Specifically, Plaintiff contends that three secular uses—model homes, home-based occupations, and day care centers—are allowed in R–1A zones even though they are "commercial activity." (*See* Doc. 168 at 7). Plaintiff asserts that the allowance of these three uses as permitted uses—without the need for a special exception—in R–1A zones violates the Equal Protection Clause.

The OCC does allow model homes as a permitted use in R–1A zones, (*see* OCC § 38–77, Use Table, at 2826), and it provides a condition on them: "Model homes ... shall only be [permitted] in conjunction with an approved preliminary subdivision plan." (OCC § 38–79(125); *see also* OCC § 38–77, Use Table, at 2826 (listing this condition on model homes in use table)). Although Plaintiff contends that the allowance of model homes as a permitted use in R–1A zones violates equal protection, model homes are different in character from religious institutions. Model homes are designed to facilitate sales of residences in the neighborhood and are temporary in nature. Although model homes would, for a time, bring traffic and visitors into a neighborhood, once the homes are sold the traffic would cease. The people who live in such a neighborhood likely had visited the model home before they bought their own homes in that neighborhood, were aware of the presence of the model home, and have no colorable basis to complain about its presence in their neighborhood. They are on notice of such traffic when they purchase in that neighborhood, and they can anticipate that when the area has been bought out that traffic will cease. By contrast, people who purchase a home in a residential area would not expect to have to deal with traffic from a religious institution in their neighborhood indefinitely. Model homes simply are not analogous to religious institutions or to nonreligious places of assembly. The difference between these types of uses lies in part in the reasonable expectations of residents, and the allowance of model homes in R–1A zones does not violate equal protection.

"Home occupations" are also allowed as a permitted use in R–1A zones. (*See* OCC § 38–77, Use Table, at 2825). The OCC defines "home occupation" as follows:

> *Home occupation* shall mean any use conducted entirely within a dwelling or accessory building and carried on by an occupant thereof, which use is clearly incidental and secondary to the use of the dwelling for dwelling purposes and

14. The Fourteenth Amendment provides in pertinent part that "[no State shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

15. Article I, Section 2 of the Florida Constitution provides:

> Basic rights.—All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property .... No person shall be deprived of any right because of race, religion, national origin, or physical disability.

Fla. Const. art. I, § 2.

does not change the character thereof; and provided, that all of the following conditions are met:

> Only such commodities as are made on the premises may be sold on the premises. However, all such sales of home occupation work or products shall be conducted within a building and there shall be no outdoor display of merchandise or products, nor shall there be any display visible from outside the building. No person shall be engaged in any such home occupation other than two (2) members of the immediate family residing on the premises. No mechanical equipment shall be used or stored on the premises in connection with the home occupation, except such that is normally used for purely domestic or household purposes. Not over twenty-five (25) percent of the floor area of any one (1) story shall be used for home occupation purposes. Fabrication of articles such as commonly classified under the terms "arts and handicrafts" may be deemed a home occupation, subject to the other terms and conditions of this definition. Home occupations shall not be construed to include barber shops, beauty parlors, plant nurseries, tearooms, food processing, restaurants, sale of antiques, commercial kennels, real estate offices, or insurance offices.

OCC § 38–1, at 2810.1 (emphasis in original). This definition of "home occupation" is very limited and minimizes the chances of parking or traffic problems resulting therefrom. Occupations likely to draw patrons into the residential area are not within the definition; instead, "home occupations" are those that involve activity of an occupant of the home, within the home. Allowance of such a use is consistent with the residential character of the R–1A zone and is not likely to disrupt neighbors, and Plaintiff's equal protection challenge based on this permitted use also fails.

The final "commercial activity" upon which Plaintiff relies in his facial Equal Protection challenge is "daycare." Although Plaintiff uses only the word "daycare" in his memorandum (*See* Doc. 168 at 7), not all types of "daycare" facilities are allowed as of right in R–1A zones. "Family day care homes" are permitted (*see* OCC § 38–77, Use Table at 2826), but "day care centers" require a special exception (*see* OCC § 38–77, Use Table at 2843), as do "Adult/child day care homes" and "adult/child day care centers" (*see* OCC § 38–77, Use Table at 2826). The "family day care homes" that are permitted without a special exception in an R–1A zone are defined in the Code as follows:

> Family day care home, as defined in [Florida Statute] § 402.302(5), shall mean a residence in which child care is regularly provided for no more than ten (10) children. This shall include a maximum number of five (5) preschool children plus the elementary school siblings of the preschool children including the caregiver's own.

OCC § 38–1, at 2810. This is a very limited definition and one that plainly is designed to minimize traffic; a maximum of five outside families would employ the services of such a center, and hence a maximum of five cars would be brought into the neighborhood for drop-off and pick-up.

By contrast, a "day care center"—which, like a religious organization, requires a special exception to operate in an R–1A zone—is defined as "a structure in which the owner or operator, for compensation, provides supervision and temporary care for more than ten (10) persons, who are not related by blood or marriage and not the legal wards or foster children of the owner or operator." OCC § 38–1, at 2808. Additionally, in order for a "day care cen-

ter" to operate within an R-1A zone even with a special exception, "permanent parking" must be provided for its patrons. OCC § 38-79(26)c.1.; OCC § 38-1476(a); OCC § 38-77, Use Table, at 2843 (providing for conditions on day care centers in R-1A zones). The permanent parking required for such centers consists of "1 space for each 10 children, plus a pickup and dropoff area equal to 1 space for each 10 children." OCC § 38-1476(a). The differences between "family day care homes," which are permitted in R-1A zones, and "day care centers," which, like religious organizations, require a special exception to operate in such zones, are obvious.

In sum, none of the three secular uses identified by Plaintiff is similar to a "religious organization" use for an R-1A zone. Like other places of assembly that would likely result in traffic and congestion, religious organizations are not permitted as a matter of right in such zones. Moreover, there are hundreds of other uses that are not allowed in an R-1A zone even with a special exception. Thus, Plaintiff's facial Equal Protection challenge fails.

██ Plaintiff also argues that the OCC violates equal protection as it has been applied against him because other, similarly situated persons have received more favorable treatment. "[I]n order to maintain an equal protection claim with any significance independent of the free exercise count which has already been raised. [Plaintiff] must also allege and prove that [he] received different treatment from other similarly situated individuals or groups." *Brown v. Borough of Mahaffey,* 35 F.3d 846, 850 (3d Cir.1994). Plaintiff has failed to do so.

Plaintiff contends that other religious groups received more favorable treatment because they have been permitted to meet in residences without being cited. However, the evidence presented before the Board regarding Bible study groups showed that those groups were not similarly situated to Plaintiff. First, those groups met once a week. Although one pastor did make a vague statement at the hearing that his church's prayer groups meet at most 2-3 times per week (Ex. 1 to Doc. 205, at 53), no evidence was presented that any other group met with a frequency similar to that of the assemblies occurring at Plaintiff's property. Additionally, aside from the difference in frequency, the overwhelming evidence regarding the advertising, signage, and the manner in which Plaintiff's property was held out to the public distinguish it from the once-a-week in-home Bible study groups. Thus, Plaintiff has not presented evidence that, based on what was presented at the Code Enforcement Board hearing, the Defendants treated him less favorably than they treated similarly situated persons.

On his as-applied equal protection challenge, Plaintiff urges this Court to consider evidence that was not before the Code Enforcement Board. As noted earlier, in their first summary judgment motion Defendants had relied on this type of evidence and Plaintiff objected, contending that the only evidence germane to the as-applied challenge[16] is that evidence presented to and considered by the Code Enforcement Board. Defendants agreed and modified their argument accordingly. Notwithstanding Plaintiff's assertions, to which the Defendants have now acquiesced, that the only relevant evidence before this Court is the evidence that was before the Board at the March 2002 hear-

16. Plaintiff agrees that "[t]he facial challenge does not require a disputed factual analysis." (Doc. 168 at 20).

ing, as to his as-applied equal protection claim Plaintiff now contends that the Court should consider facts that arose after that hearing. Defendants maintain that this evidence should not be considered. Plaintiff's as-applied challenge fails whether this evidence is considered or not, but this evidence upon which Plaintiff so heavily relies will briefly be discussed.

Plaintiff contends that the Defendants treated Paul Bosch, another county resident who has a regular prayer group in his home, more favorably. However, it is clear that Bosch and Plaintiff are not similarly situated. In his December 2002 deposition, Bosch testified that he is a member of Bay Hill Baptist Church ("Bay Hill"). (Dep. of Paul Bosch, Ex. 16 to Doc. 125, at 10). Bay Hill does not have a sanctuary, but its congregation meets for Sunday services at an elementary school. (Ex. 16 to Doc. 125, at 10). On Wednesday evenings, a youth fellowship group meets at Bosch's home. (Ex. 16 to Doc. 125, at 11). Although the youth fellowship group is listed on Bay Hill's website, it does not list Bosch's residence as the location for the group or mention the Wednesday night meetings specifically; those interested in the fellowship group are directed to the main Bay Hill telephone number for further information. (Ex. 16 to Doc. 125, at 12–14).

In addition to the Wednesday night youth fellowship meetings at Bosch's home, Bay Hill has three or four youth-related Bible studies and four or five adult Bible study groups that are conducted in other members' homes once a week. (Ex. 16 to Doc. 125, at 15–17). None of Bay Hill's in-home groups have met or intend to meet more frequently than once a week. (Ex. 16 to Doc. 125, at 140). Other than the youth meetings at Bosch's house on Wednesdays, Bosch stated that he and his wife "constantly have youth at our house," meaning that "[y]outh come to our house to visit with my sons . . . or to watch TV," and while they are there Bosch talks to them and sometimes they pray. (Ex. 16 to Doc. 125, at 36). Additionally, Mrs. Bosch formerly hosted a women's Bible study group in the home on Thursday evenings; those meetings occurred during the same time period that Bosch was having the Wednesday night meetings. (Ex. 16 to Doc. 125, at 38). The Bay Hill bulletin lists Bosch and his wife as "Youth Leaders," and the bulletin contains a listing of "Weekday [small group] Opportunities—7 pm" which includes "Wednesday—'Youth Gathering' (Bosch's home)." (Ex. 2A to Bosch Dep.). Additionally, at one time the in-home Bosch Bible study was listed in the "community bulletin board" section of a local community newspaper, although Bosch was not sure who provided the information to the newspaper. (Ex. 16 to Doc. 125, at 70–71).

On May 2, 2002, Code Enforcement Officer George LaPorte wrote the Bosches a letter advising them that a code violation had been observed at their property. (Ex. 2D to Bosch. Dep.; Ex. 16 to Doc. 125, at 45). Someone had made a complaint that there were a lot of cars parked on the street, and Bosch look steps to alleviate that problem by having people park in his driveway and by making arrangements with neighbors for people to be able to park in the neighbors' driveways. (Ex. 16 to Doc. 125, at 52–55). After receiving the letter from LaPorte, Bosch did not stop having the Bible study in his home on Wednesdays, nor did he apply for a variance. (Ex. 16 to Doc. 125, at 68–69). However, Bosch did make "a conscious effort not to have the cars parked on the street for the Wednesday night service." (Ex. 16 to Doc. 125, at 139).

On June 21, 2002, the manager of the County's Code Enforcement Division sent the Bosches a letter informing them that "[a] re-inspection [of their property] took

place on or about May 14, 2002, and a determination was made not to proceed with the violation." (Ex. 2B to Bosch Dep., at 1). The letter stated that the division's determination had been based on (1) the fact that the parking problems had been resolved and (2) the division's conclusion that Bosch was not "operating a 'religious institution' as that term is used in [the] zoning regulations." (Ex. 2B to Bosch Dep., at 1). The June 21 letter included a nonexclusive list of fourteen factors that the division considers in determining whether a homeowner is operating a religious institution. (Ex. 2B to Bosch. Dep., at 1–2). Among the fourteen factors are: the frequency of the activity; whether the leaders of the activity hold themselves out to be religious clergy; whether the property is held out to the public as a church, synagogue, or other place of worship; and whether the property is the primary site of worship for the participants. (Ex. 2B to Bosch. Dep., at 1–2).

This evidence does not support Plaintiff's as-applied equal protection claim. Although Plaintiff contends that "[i]n addition to the Bosch home, numerous people associated with Bay Hill Baptist Church utilize their homes in Orange County for religious activities once or more per week on a regular and ongoing basis," (Doc. 168 at 7), the evidence upon which Plaintiff relies shows that the activities in other homes occur at most once per week—not more. The activities at Plaintiff's home occurred much more often than once per week, and the difference in frequency is very significant. Moreover, Bosch's testimony reflects significant differences in the manner in which the Bosch property, and Bosch himself, were held out to the public. Thus, Plaintiff and Bosch are not similarly situated, and even considering the evidence relied upon by Plaintiff regarding Bosch, there is no evidentiary support for Plaintiff's as-applied Equal Protection claim. Defendants are entitled to summary judgment on Count II.

*5. Establishment Clause (Count III)*

█ In Count III, Plaintiff alleges that the zoning laws violate the Establishment Clause of the First Amendment of the United States Constitution[17] and Article I, Section 3 of the Florida Constitution.[18] In order to satisfy the Establishment Clause, a statute or ordinance must pass the three-part test set forth by the United States Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) ("the *Lemon* test"). To survive an Establishment Clause challenge under the *Lemon* test, "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U.S. at 612–13, 91 S.Ct. 2105 (citations omitted) (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). Under the Florida Constitution, there is a fourth consideration that is added to the *Lemon* test: "'The statute must not authorize the use of public moneys, directly or indirectly, in aid of any sectarian institution.'" *Rice v. State,* 754 So.2d 881, 883 (Fla. 5th DCA 2000) (quoting *Silver Rose Entm't, Inc. v. Clay County,* 646 So.2d 246, 251 (Fla. 1st DCA 1994)).

█ The OCC provisions at issue easily satisfy the *Lemon* test and the additional fourth element applicable under the Florida Constitution. First, zoning schemes

17. The First Amendment provides in pertinent part that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I.

18. Article I, Section 3 of the Florida Constitution provides in pertinent part that "[t]here shall be no law respecting the establishment of religion." Fla. Const. art. I, § 3.

like the one at issue here are generally recognized as having a secular purpose. *See, e.g., Grosz v. City of Miami,* 721 F.2d 729, 738 (11th Cir.1983) ("That the [zoning] law has both secular purpose and effect is noncontroversial. No one contends that zoning laws are based upon disagreement with religious tenets or are aimed at impeding religion."); *Concerned Citizens of Carderock v. Hubbard,* 84 F.Supp.2d 668, 673 (D.Md.2000) ("Defendants assert a secular purpose motivates the challenged zoning scheme: that it is meant to foster development which is harmonious and compatible with single family residential use. This is, indisputably, a secular purpose, since it is a valid (and common) zoning objective."). Indeed, Plaintiff offers no evidence that the Orange County zoning ordinance has a nonsecular purpose.

Second, there is no evidence in the record that the primary effect of the Orange County ordinance is to advance or inhibit religion, and as the Eleventh Circuit noted in *Grosz,* "given zoning's historical function in protecting public health and welfare and the incidental nature of the asserted burden on religion, the essential effect of zoning laws is clearly secular." 721 F.2d at 738 (citation omitted). Third, Plaintiff has offered no evidence to show that the ordinances at issue foster an entanglement between the government and religion. *See, e.g., Ehlers–Renzi v. Connelly Sch. of the Holy Child, Inc.,* 224 F.3d 283, 291 (4th Cir.2000) (concluding that county zoning ordinance exempting religious school from special exception requirement did not foster excessive entanglement, noting that "the parties appear to agree that it has a disentangling aspect, avoiding governmental intrusion into matters of religious education"); *cf. Tony & Susan Alamo Found., v. Sec'y of Labor,* 471 U.S. 290, 305–06, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (finding that Fair Labor Standards Act's recordkeeping requirements did not entangle the government with religious employers and stating that "[t]he Establishment Clause does not exempt religious organizations from such secular governmental activity as fire inspections and building and zoning regulations, and the recordkeeping requirements of the Fair Labor Standards Act, while perhaps more burdensome in terms of paperwork, are not significantly more intrusive into religious affairs") (citation omitted). Finally, Plaintiff does not contend that the ordinances authorize public monies in aid of a particular group, and thus the OCC provisions satisfy the fourth prong of the test applicable under the Florida constitution.

In sum, there is no evidence to support a facial or as-applied Establishment Clause violation. Thus, the Defendants are entitled to summary judgment on Count III.

*6. Free Speech and Assembly (Count VI)*

█ In Count VI of the Complaint, Plaintiff alleges that the zoning laws violate his rights to freedom of speech and freedom of assembly under the First Amendment to the United States Constitution [19] and Article I, Sections 4 and 5 of the Florida Constitution.[20] The Defendants

19. In this regard, the First Amendment provides that "Congress shall make no law ... abridging the freedom of speech ... or the right of the people peaceably to assemble." U.S. Const. amend. I.

20. These provisions of the Florida Constitution provide:

Section 4. Freedom of speech and press.—Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press....

Section 5. Right to assemble.—The people shall have the right peaceably to assem-

contend that they are entitled to summary judgment on this Count because the zoning ordinances are not content-based restrictions on speech and are reasonable time, place, and manner restrictions on speech.

As explained by the Eleventh Circuit in *One World One Family Now v. City of Miami Beach,* 175 F.3d 1282, 1286 (11th Cir.1999), if a restriction on speech is content-based, strict scrutiny applies, and if the restriction is content-neutral, the court examines whether it is a permissible time, place, and manner restriction. Assuming arguendo that there are First Amendment speech rights at issue in this case, the OCC zoning ordinances are not content-based regulations of speech, but instead are neutral and generally applicable land use regulations; the fact that "religious institution" is listed in the ordinance does not render it content-based.

Although religious organizations are among those that are required to obtain special exceptions to locate in an R-1A district, the ordinance is purely secular, does not challenge or impede religious practices, and treats religious and nonreligious assemblies in the same manner. As the Seventh Circuit recently held with respect to a similar zoning provision, "to the extent that the [ordinance] incidentally regulates speech or assembly within churches, such regulation is motivated not by any disagreement that [the city] might have with the message conveyed by church speech or assembly, but rather by such legitimate, practical considerations as the promotion of harmonious and efficient land use. In this respect it is content neutral." *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 765 (7th Cir. 2003), *reh'g en banc denied; accord Petra Presbyterian Church v. Vill. of Northbrook,* No. 03 C 1936, 2003 WL 22048089, at *9 (N.D.Ill. Aug.29, 2003) (finding no free speech violation, noting that there was no evidence suggesting that the purpose of zoning ordinance was to restrict religious speech); *cf. State v. Conforti,* 688 So.2d 350, 354 (Fla. 4th DCA 1997) ("If a statute does not restrict conduct because of the message it expresses, it if is aimed at the 'noncommunicative impact of an act,' then the law is 'content neutral.' ") (quoting Laurence H. Tribe, American Constitutional Law § 12-2, at 792 (2d ed.1988)).

Because the OCC zoning provisions are content-neutral, they are properly analyzed as time, place, and manner restrictions and thus must be narrowly tailored to serve a legitimate government objective and must leave open ample channels of alternative communication. *See Civil Liberties,* 342 F.3d at 765. "In order to satisfy the requirement that it is narrowly tailored, 'a regulation need not be the least restrictive or least intrusive means,' " but "need only further 'a substantial government interest that would be achieved less effectively absent the regulation.' " *Id.* (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 798-99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

The OCC zoning scheme satisfies this test. The zoning ordinances clearly further the County's interest in maintaining the residential character of neighborhoods in R-1A zones and in controlling traffic and congestion. Without the regulation of religious organizations and other group assemblies, these objectives would be achieved less effectively. *See, e.g., Grace United Methodist Church v. City of Cheyenne,* 235 F.Supp.2d 1186, 1204 (D.Wyo. 2002) (finding no violation of freedom of speech or association, noting that the fact that the church was required to comply with city zoning scheme did "not violate its rights to free speech or freedom of associ-

ble, to instruct their representatives, and to petition for redress of grievances. Fla. Const. art. I, §§ 4-5.

ation because the City has an important governmental interest in preserving the character of specific areas of [the city], such as this quiet residential area. The ... zoning ordinance ... is unrelated to the suppression of speech and does not burden more speech, if any, than necessary to further that interest.").

There is no evidence that Plaintiff has been prevented from speaking in his home, and there are ample alternative sites—including some that Plaintiff and his fellow worshipers used even before Plaintiff was cited by the County—available for speech, assembly, and worship in the County. As the Seventh Circuit held in *Civil Liberties:*

> [A]ny population center ... has a substantial interest in regulating the use of its land and ... the [zoning ordinance] promotes that interest. We are also unpersuaded by Appellants' implicit suggestion that the restriction of church use as of right to R zones leaves churches with insufficient channels of communication. Not only may churches freely disseminate religious speech in a majority of [city] land zoned for development, but they may also disseminate ... religious speech in [other] districts with Special Use approval. Similarly, the Planned Development approval process provides larger churches with ample opportunity to locate within [the city] in a manner consistent with the [zoning ordinance's] legitimate, stated purposes. For these reasons, Appellants' First Amendment freedom of speech and freedom of assembly claims are without merit.

342 F.3d at 765–66. The Orange County zoning ordinance is no more restrictive of religious speech and assembly than was the ordinance discussed in *Civil Liberties,* and the Defendants prevail on Count VI.

*7. Right to Privacy (Count VII)*

In Count VII, Plaintiff alleges that the zoning laws violate his right to privacy under the First Amendment to the United States Constitution [21] and Article I, Section 23 of the Florida Constitution.[22] The right to privacy under the Florida Constitution is broader than the federal constitutional right; it " 'embraces more privacy interests, and extends more protection to the individual in those interests, than does the federal Constitution.' " *State v. Conforti,* 688 So.2d 350, 357 (Fla. 4th DCA 1997) (quoting *In re T.W.,* 551 So.2d 1186, 1192 (Fla.1989)).

The Defendants assert that there is no evidence that Plaintiff had a reasonable expectation of privacy, which is a prerequisite for the right to attach. Defendants argue that because Plaintiff advertised the in-home prayer services on the internet, he waived any expectation of

21. The right to privacy is implicit in the United States Constitution. *See, e.g., Carey v. Population Servs. Int'l,* 431 U.S. 678, 684, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) ("Although '[t]he Constitution does not explicitly mention any right of privacy,' the Court has recognized that one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.' ") (quoting *Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)); *see also State v. Conforti,* 688 So.2d 350, 357 (Fla. 4th DCA 1997) (noting implied privacy right in federal constitution).

22. Article I, Section 23 of the Florida Constitution provides:

> Section 23. Right of privacy.—Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.

Fla. Const. art. I, § 23.

privacy that he otherwise might have had. Defendants are correct.

"Before the right to privacy attaches ..., there must be a 'legitimate' expectation of privacy. 'Determining whether an individual has a legitimate expectation of privacy in any given case must be made by considering all the circumstances, especially objective manifestations of that expectation.'" *Conforti,* 688 So.2d at 357–58 (quoting *Stall v. State,* 570 So.2d 257, 260 (Fla.1990)) (internal citations omitted). Where activity occurs in a place—even a residence—that is open to the public and which is advertised as open to the public, there is no legitimate expectation of privacy. *Cf. Peters v. Vinatieri,* 102 Wash.App. 641, 9 P.3d 909, 916 (2000) (finding that plaintiff did not have a reasonable expectation of privacy in areas of his home to which he invited the public for commercial purposes and in which an office sign had been posted); *In re Gregory S.,* 112 Cal. App.3d 764, 169 Cal.Rptr. 540, 546 (Ct. App.1981) (noting that no reasonable expectation of privacy exists in areas of private property to which the public has been invited).

Here, members of the public were invited—via the Internet and other means—to Plaintiff's home. Also, a sign had been posted on the Property directing the invited participants to the appropriate door to use for the advertised activities. Furthermore, one of the participants in the activities at Plaintiff's home testified on Plaintiff's behalf at the code enforcement hearing regarding the nature of the activities; it is not as if the code enforcement officers snuck in or engaged in any trickery to gain access to the premises. Although Plaintiff may now be unhappy with the information provided by that participant, Plaintiff's protestations about having an expectation that what went on in his home would be private ring hollow. And, in any event, the Defendants have not limited what Plaintiff or his family may do in the home. *See Murphy v. Zoning Comm'n of the Town of New Milford,* 289 F.Supp.2d 87, 103–05 (D.Conn. 2003). Thus, Plaintiff's privacy claim fails.

*8. Due Process (Count VIII)*

Plaintiff alleges in Count VIII that the Defendants' actions violated his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution [23] and Article I, Section 9 of the Florida Constitution.[24] Plaintiff contends that the OCC is vague and affords the Defendants unfettered discretion to decide what constitutes a code violation. Specifically, Plaintiff argues that the lack of definitions for the words "primarily" and "related" in the definition of "religious institution" render the pertinent provisions void for vagueness and gives the Defendants the power to enforce the OCC in any way they desire. Defendants, however, assert that the OCC clearly sets forth the types of uses of land that are allowed in the R–1A zone. They argue that the terms "primarily" and "related" in the OCC are easily understandable to persons of ordinary intelligence and that therefore the OCC is not unconstitutionally vague. Again, Defendants' argument is persuasive.

The Supreme Court set forth the controlling vagueness standard in *Grayned v.*

23. The Fourteenth Amendment provides in pertinent part that "[no State shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

24. Article I, Section 9 of the Florida Constitution provides in part, "No person shall be deprived of life, liberty or property without due process of law." Fla. Const. art. I, § 9.

*City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972):

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

(Footnotes omitted). Here, the words upon which Plaintiff bases his vagueness challenge—"primarily" and "related"—are not complicated words but words easily understood by a person of ordinary intelligence. *See, e.g., In re Stewart,* 175 F.3d 796, 811 (10th Cir.1999) (concluding that word "primarily" in Bankruptcy Code provision was not void for vagueness); *In re Kelly,* 841 F.2d 908, 916 (9th Cir.1988) (same, noting that "the modifier 'primarily' is not a word that is ambiguous or difficult to understand. The Constitution does not require the legislature to incorporate Webster's into each statute in order to insulate it from vagueness challenges."); *High Ol' Times, Inc. v. Busbee,* 673 F.2d 1225 (11th Cir.1982) (reversing district court's determination that statute was unconstitutionally vague and upholding that statute, which defined a "drug-related object" as "any instrument, device, or object which is primarily intended for" certain purposes); *see also Int'l Eateries of Am., Inc. v. Broward County,* 726 F.Supp. 1568, 1578 (S.D.Fla. 1989) (finding that inclusion of the word "church" in ordinance without defining it did not render the ordinance vague, noting that it "has a clear enough common meaning to provide adequate notice to those persons who may be subject to the provisions of the distance ordinances").[25] Thus, these words do not render the OCC provisions at issue void on their face for vagueness.[26] Interestingly, despite the assertions of Plaintiff's attorney that the OCC is abominably written and that he has much experience in writing constitutionally sound codes, he has not submitted an improved-upon version of the OCC despite first volunteering and then being invited to do so.

Additionally, there is no evidence of arbitrary or discriminatory enforcement of the Orange County zoning ordinances by the Defendants. The record reflects, inter

25. *Cf. L.B. v. State,* 700 So.2d 370, 371–72 (Fla.1997) (concluding "that the term 'common pocketknife,' as contained in the statute, does provide persons of ordinary intelligence with fair notice as to what constitutes forbidden conduct"); *Life Concepts, Inc. v. Harden,* 562 So.2d 726, 728 (Fla. 5th DCA 1990) (holding that the word "compatible" in city ordinance requiring group living facilities to be "compatible with the neighborhood" did not render ordinance vague; "the word 'compatible' has a plain and ordinary meaning which can be readily understood").

26. As noted earlier, Plaintiff did not appeal the Code Enforcement Board's factual determination that the activities at his house violated the OCC. It has been held that such a failure to appeal precludes a plaintiff from arguing that an ordinance is vague or overbroad. *See Tran v. Gwinn,* 262 Va. 572, 554 S.E.2d 63, 69 (2001) ("Tran's conduct in operating a church falls squarely within the ordinance's application and Tran concedes as much by not appealing the factual determinations of the trial court and board of zoning appeals that he was operating a church. The failure to appeal this factual finding precludes Tran from arguing here that the ordinance is vague or overbroad such that it violates his due process rights. Nor can Tran be heard to complain about the rights of others who may be adversely affected by the ordinance. Tran is not within the class of people who may raise a due process claim against this ordinance.").

alia: that meetings or services were scheduled to be held at the Property every day of the week; that those services were advertised on the internet; that the Property's address was listed as the address for the "Chabad of South Orlando"; that groups of people were observed entering the property on 72% of the days on which observation of the Property was made; that one of the attendees testified regarding the religious services being held at the Property; that a sign was maintained on the Property directing visitors to use a specific door for the "shul"; and that Plaintiff, a rabbi, was listed as the "director" of this "chabad." Given this overwhelming evidence that a religious institution was operating at the Property, there is no question that the ordinary meanings of "primarily" and "related" have been satisfied and that the OCC would place a person of ordinary intelligence on notice that it was not permissible to conduct these activities in an R–1A zone without first obtaining a special exception. Thus, both the facial and as-applied due process challenges fail, and the Defendants are entitled to summary judgment on Count VIII.

*9. Civil Conspiracy (Count IX)*

In Count IX, Plaintiff contends that the individual Defendants—Joel Hammock, Jim Powers, Robert Burns, and Robert High—conspired to violate his rights. During oral argument, the Court asked Plaintiff's counsel what evidence in the record supported this claim. (Tr. of Hr'g on Mot. for Summ. J., Doc. 223 at 148). Counsel responded that the record of the Code Enforcement Board hearing supported this count because it showed "[t]hat the county board members knew that, in fact, other homes met, other people met for religious activity in homes at least three times a week, and at best, they, the board was presented any evidence of at best three times per week. That's it.... The conspiracy is that they violated through a civil conspiracy the equal protection rights of our client. That's the point. That's where that's tied in." (Doc. 223 at 149–50). Counsel did not have any other evidence to support this count other than the record of the Code Enforcement Board hearing. (Doc. 223 at 150).

"An action for civil conspiracy ordinarily requires proof of an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of that illegal objective, and a resulting injury to the plaintiff." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 912 (11th Cir.1998); *accord Tucci v. Smoothie King Franchises, Inc.*, 215 F.Supp.2d 1295, 1300 (M.D.Fla.2002). The transcript of the Code Enforcement Board hearing (Ex. 1 to Doc. 205) does not support Plaintiff's civil conspiracy claim. That transcript does not show that there was any agreement among the individual Defendants to violate Plaintiff's constitutional rights or otherwise act illegally, and thus the conspiracy count fails at the first element. *See, e.g., Bivens Gardens*, 140 F.3d at 912 ("None of the evidence plaintiff adduced at trial supports an inference that an agreement existed among the defendants to defraud the hotel of profits."); *Tucci*, 215 F.Supp.2d at 1302 ("There are no facts to support an inference that there was an agreement between [the defendants]."). Instead, the hearing transcript merely reflects a discussion among the individual Defendants and the other Board members regarding whether Plaintiff had violated the OCC; this is not the equivalent of a civil conspiracy. The individual Defendants are entitled to summary judgment on Count IX.

*10. Qualified Immunity of the Individual Defendants*

Finally, the Individual Defendants have raised the defense of qualified immunity in this case. The Supreme Court set forth

the analytical framework for qualified immunity cases in *Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001):

> A court required to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? ...
>
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition ....
>
> ... "The contours of the right [that the official is alleged to have violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

(Citations omitted). Thus, as to the Individual Defendants' qualified immunity defense, a two-step analysis is required. First, the Court must evaluate whether the alleged conduct of the particular defendant violated a constitutional right. If so, then secondly the Court must assess whether that right was clearly established.

As discussed earlier, the Court has found no constitutional infirmity in the zoning provisions of the OCC either on their face or as applied by the Defendants. Therefore, the Individual Defendants have not violated any of Plaintiff's constitutional rights. Moreover, even if this Court had found the zoning provisions to be constitutionally deficient, the doctrine of qualified immunity would shield the Individual Defendants, members of the Code Enforcement Board who are accused of no more than carrying out their responsibilities and following the provisions of the OCC. It would not be clear to a reasonable Code Enforcement Board member "that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151.

*III. Conclusion*

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The Defendants' Alternative Motion for Summary Judgment (Doc. 203) is **GRANTED** as to all nine counts of the Complaint.

2. All other pending motions are **DENIED as moot.**

3. The Clerk is directed to enter a judgment providing that Plaintiff shall take nothing from the Defendants in this action. Thereafter, the Clerk shall close this file.